674

Anne CANTRELL, an individual; Lou Anna Denison, an individual; Kenneth N. Larkey, an individual; Collette Marie McLaughlin, an individual; Richard C. McLaughlin, an individual; Billie C. Schaeffer, an individual; Glen Underhill, an individual; Margherita Underhill, an individual, Plaintiffs–Appellants,

v.

CITY OF LONG BEACH; City of Long Beach, acting by and through its Board of Harbor Commissioners as the Port of Long Beach; United States Department of the Navy; John W. Hancock; Roy E. Hearrean; John E. Kashiwabara, M.D.; George M. Murchison; Carmen O. Perez, Defendants–Appellees,

and

California State Lands Commission, Defendant.

No. 98–56940.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 6, 2000

Filed Feb. 5, 2001

Richard I. Fine, Los Angeles, California, for the plaintiffs-appellants.

Dominic T. Holzhaus, Long Beach, California, and M. Katherine Jensen, Rutan & Tucker, Costa Mesa, California, for defendant-appellee City of Long Beach.

John K. Rubiner and Eliot Krieger, U.S. Attorney's Office, Los Angeles, California, for the defendant-appellee United States Department of the Navy.

Before: REINHARDT and BERZON, Circuit Judges, and BREYER,[1] District Judge.

REINHARDT, Circuit Judge:

This appeal raises issues relating to environmental standing under the National Environmental Policy Act ("NEPA") and state taxpayer standing. We hold that the appellants have standing to challenge the adequacy of the Navy's Environmental Impact Statement under NEPA, but have not established taxpayer standing sufficient to bring their state law claims in federal court.

## I. BACKGROUND

This dispute concerns the plans for the future use of the closed Long Beach Naval Station ("Naval Station"). The Naval Station is located on Terminal Island in the Port of Long Beach. Several of the buildings on the Naval Station were designed by Los Angeles architect Paul R. Williams, the first African–American fellow of the American Institute of Architects and principal architect for the U.S. Navy during the World War II era. A number of the structures on the station qualified for inclusion on the National Register of Historic Places due to their strong association with the development of the Roosevelt Base as an administrative center for training and for ship repair of the Pacific Fleet during the Second World War.

At the time the complaint in this case was filed, portions of the Naval Station served as a habitat for several bird species. Two federally endangered species, the California least tern and the California brown pelican, foraged in 26 acres of shallow water habitat in the area of the station known as the West Basin. The black-crowned night heron, which is protected by the Migratory Bird Act of 1918 and has been classified by the California Department of Fish and Game as a "California special animal," had rookeries in the large ornamental ficus trees on the Naval Station.

In 1991, the Department of Defense announced that the Long Beach station would be closed, and in 1994 the Navy ceased operations at the station. To prepare the area for its planned use as a commercial marine container terminal, the historic buildings on the base have been demolished, the ornamental ficus trees destroyed, and the shallow water habitat dredged. The appellants ("the birdwatchers") are residents of Long Beach and Lakewood, California. They belong to a variety of environmental groups and have opposed the plan to destroy the buildings and bird habitats on the Naval Station in

1. The Honorable Charles R. Breyer, United States District Judge for the Northern District of California, sitting by designation.

preparation for the future use of the property.

Before disposing of any surplus real property located at a military installation scheduled for closure, the Defense Base Closure and Realignment Act ("DBCRA") requires the Secretary of Defense to consider redevelopment plans submitted by affected local governments for the use of such property by the local community. *See* Defense Base Closure and Realignment Act of 1990, Pub.L. No. 101–510 § 2905(b)(2)(D); 104 Stat. 1808 (1991). Before transferring the surplus property to the local government, the Secretary of Defense must prepare a decision document in accordance with NEPA. NEPA requires any federal agency considering "major Federal actions significantly affecting the quality of the human environment" to prepare an environmental impact statement ("EIS") identifying the environmental consequences of the proposed action and recommending ways to minimize those which are adverse. 42 U.S.C. § 4332(C). Under the DBCRA procedures, the local government's redevelopment plan is to be treated as part of the proposed federal action. *See* Pub.L. No. 101–510 § 2905(b)(7)(K)(ii).

The Navy designated the City of Long Beach as its Local Reuse Authority. In 1992, the Long Beach City Council authorized the formation of the Navy Properties Reuse Committee ("NPR") to develop a reuse plan. The birdwatchers allege that the NPR failed to actively develop reuse proposals, but instead, early in the process, summarily decided on a marine container terminal to be leased to the Chinese Overseas Shipping Company.

In September 1996, the Board of Harbor Commissioners, approved an environmental impact report, mandated by the California Environmental Quality Act, for the development of a marine container terminal at the Naval Station. In April 1998, the Navy and the City of Long Beach issued a joint final environmental impact statement (FEIS) under NEPA. The FEIS evaluated four alternatives: the marine container proposal, an auto terminal, an institutional campus, and the "no project alternative." The birdwatchers allege that the FEIS was deficient because it did not give full and complete consideration to the environmental effects of the marine container terminal proposal, and because the Navy adopted an unreasonably small range of reuse project alternatives. In May 1998, the Navy issued its "Record of Decision for Disposal and Reuse of Naval Station Long Beach" approving Long Beach's plan to convert the former station into a commercial marine container terminal.

The original complaint in this matter was filed in the District Court on June 15, 1998. The primary defendants were the City of Long Beach and the United States Department of the Navy. The complaint set forth state law claims against the City of Long Beach alleging violations of the state tidelands trust, and contending that the proposed use is a waste of public assets and a public gift in violation of the California Constitution. The action against the Navy set forth not only these state taxpayer claims, but also challenged the adequacy of the FEIS under NEPA. Over the summer, the district court denied two ex parte applications for a temporary restraining order, and dismissed the complaint for lack of standing with leave to amend. The birdwatchers then filed an amended complaint and two further unsuccessful ex parte applications for a temporary restraining order. By October, the City of Long Beach began to tear down the buildings and trees at the Naval Station in preparation for the marine container terminal. On December 8, the district court denied the birdwatchers' motion for a preliminary injunction, and granted appellees' motion to dismiss for lack of standing without leave to amend. By the time appellants filed their brief in this appeal in May 1999, the historic buildings and bird habitats on the Naval Station had been destroyed.

## II. MOOTNESS

■ Long Beach and the Navy contend that this appeal is moot because the historic buildings on the Naval Station have been destroyed and the trees and structures of the station have been razed in preparation for the construction of the marine container terminal. The burden of demonstrating mootness is a heavy one. *Northwest Environmental Defense Center v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988) (citing *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)). A case becomes moot whenever it "los[es] its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law." *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969). In deciding a mootness issue, "the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be any effective relief." *Gordon*, 849 F.2d at 1244–45 (quoting *Garcia v. Lawn*, 805 F.2d 1400, 1403 (9th Cir.1986)).

We recently addressed mootness in the context of NEPA in *West v. Secretary of the Department of Transportation*, 206 F.3d 920 (9th Cir.2000). In *West*, we held that an action challenging an agency decision to exclude a two-stage highway interchange project from review under NEPA was not moot even though the first stage of the project was complete and the new interchange was carrying traffic. Pointing out that "[t]he central question of all mootness problems is whether changes in the circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief," *id.* at 925 n. 4 (quoting Wright & Miller: 13A Federal Practice and Procedure § 3533.3 at 268 (1984)), we found that effective relief could still be granted in the form of requiring additional environmental review and conceivably ordering the interchange closed or taken down. *Id.* at 925. Similarly, in *Gordon*, we reversed the district court's

holding that a challenge to regulations governing the 1986 salmon fishing season was mooted by the close of the season. *Gordon*, 849 F.2d at 1245. We held that "[t]he fact that the alleged violation has itself ceased is not sufficient to render a case moot. As long as effective relief may still be available to counteract the effects of the violation, the controversy remains live and present." *Id.* at 1245. We found that the damage caused by the 1986 measures could be repaired or mitigated "obviously not by restoring the fish harvested in 1986, but by allowing more fish to spawn in 1989." *Id.; see also Tyler v. Cuomo*, 236 F.3d 1124, 1137 (9th Cir. 2000) (holding that a challenge to a housing project is not mooted by the completion of the project "because changes can still be made to alleviate any adverse effects"); *Pyramid Lake Paiute Tribe v. Hodel*, 882 F.2d 364, 368–69 (9th Cir.1989) (challenge to water diversion is not mooted after diversion took place where impacts on fishery could be remedied by storing more water in a reservoir for use in future spawning seasons).

When evaluating the issue of mootness in NEPA cases, we have repeatedly emphasized that if the completion of the action challenged under NEPA is sufficient to render the case nonjusticiable, entities "could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine. Such a result is not acceptable." *West*, 206 F.3d at 925 (quoting *Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 592 n. 1 (9th Cir.1981)). Accordingly, defendants in NEPA cases face a particularly heavy burden in establishing mootness.

■ On appeal, the birdwatchers concede that the destruction of the historic buildings on the Naval Station cannot be remedied. Nevertheless, if required to undertake additional environmental review, the defendants could consider alternatives to the current reuse plan, and develop

ways to mitigate the damage to the birds' habitat by, for example, creating new nesting and foraging areas on the land that was formerly the station or utilizing other nearby land for mitigation purposes. Since effective relief may still be available, the demolition of the Naval Station was insufficient to render the case moot.

### III. STANDING UNDER NEPA

 The Navy contends that the birdwatchers do not have standing to challenge the adequacy of its environmental impact statement regarding the Naval Station's proposed reuse. To satisfy Article III's standing requirements, a plaintiff must show

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000). In addition to these constitutional requirements, a plaintiff bringing suit under the Administrative Procedure Act for a violation of NEPA[2] must show that his alleged injury falls within the "zone of interests" that NEPA was designed to protect. *Douglas County v. Babbitt*, 48 F.3d 1495, 1499 (9th Cir.1995). The Navy does not dispute that the birdwatchers have satisfied this prudential standing requirement. The birdwatchers' interest in pre-serving the historic buildings and natural environment of the Naval Station and preventing adverse environmental effects from its proposed reuse falls squarely within the zone of interests protected by NEPA. *See, e.g.*, 42 U.S.C. § 4331(b)(4) (noting congressional purpose to "preserve important historic, cultural, and natural aspects of our national heritage"). Accordingly, we consider below whether the birdwatchers have met the standing requirements under Article III.

*Injury in fact*

 NEPA is a procedural statute, *City of Davis v. Coleman*, 521 F.2d 661, 670 (9th Cir.1975), and the birdwatchers allege a "procedural injury" by challenging the adequacy of the Navy's FEIS. To satisfy the injury in fact requirement, a plaintiff asserting a procedural injury must show that "the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n. 8, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In NEPA cases, we have described this "concrete interest" test as requiring a "geographic nexus" between the individual asserting the claim and the location suffering an environmental impact. *Douglas County*, 48 F.3d at 1500 n. 5 (stating that the geographic nexus test is the same as the concrete interest test). In this case, the fact that the birdwatchers are seeking to enforce a procedural right does not affect our injury in fact analysis: as in conventional standing cases, the birdwatchers must show the invasion of a concrete and particularized interest.[3]

---

**2.** Although NEPA does not provide a private right of action for violations of its provisions, private parties may enforce the requirements of NEPA by bringing an action against the federal agency under § 10(a) of the Administrative Procedure Act. *See* 5 U.S.C. § 702; *Lujan v. National Wildlife Federation*, 497 U.S. 871, 882–83, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

**3.** The injury in fact requirements are adjusted for plaintiffs raising procedural issues in that although they must show a "concrete interest" at stake, they need not show that the substantive environmental harm is imminent. *Defenders of Wildlife*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130 ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for ... immediacy. Thus, ... one living adjacent to the site of a federally licensed dam has standing to challenge the licensing agency's failure

The birdwatchers assert that they have a concrete interest in viewing the birds and natural environment at the Naval Station. The Supreme Court has held that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw,* 528 U.S. at 183, 120 S.Ct. at 705 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)); *see also Defenders of Wildlife,* 504 U.S. at 562–63, 112 S.Ct. 2130 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing."). An environmental plaintiff need not live nearby to establish a concrete injury; "[r]epeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person." *Ecological Rights Foundation ("ERF") v. Pacific Lumber Co.,* 230 F.3d 1141, 1149 (9th Cir.2000).

■ The birdwatchers have demonstrated a sufficiently concrete interest to establish an injury in fact under the test set forth in *Laidlaw.* For example, the complaint alleges that Plaintiff Anne Cantrell, a resident of Long Beach, has on several occasions, both before and after the closure of the Naval Station, visited the areas in and around the station to observe the habitats of the least terns, the brown pelicans, and the black crown night herons, and that the removal of the bird habitats "would directly affect her interest in and appreciation of [the bird habitats] and ability to enjoy such." The complaint alleges

that each of the other plaintiffs similarly conducted regular visits to observe the bird habitats at the Naval Station, continued to do so from areas "adjacent to and outside" the station after it was closed to the public, and had specific plans to make similar visits in the future. In declarations in opposition to the motion to dismiss, plaintiffs Cantrell and Larkey stated that they drove and walked around the perimeter of the station on several occasions to view the birds and nesting areas, and had specific plans to visit the areas around the station in the future. The complaint and declarations thus assert that the removal of the trees and the shallow water habitat at the Naval Station would directly and concretely affect the birdwatchers' recreational and aesthetic interests.

The birdwatchers' averments that they had visited the affected area in the past and that the defendant's challenged activity would impede their ability to appreciate and use the specified area are sufficient to establish that they have suffered an injury to a concrete and particularized interest. *See Laidlaw,* 528 U.S. at 183, 120 S.Ct. at 705. However, the Navy raises an additional objection. Citing the Supreme Court's statement in *Defenders of Wildlife* that the asserted injury must be an invasion of a "legally protected interest," 504 U.S. at 560, 112 S.Ct. 2130, the Navy argues that the birdwatchers cannot establish standing because they have no legal right to enter the closed station or to stand adjacent to the station and gaze over the property line at the birds and their habitat. We need not decide whether the birdwatchers have a legal right of access to the Naval Station[4] because their desire to

to prepare an environmental impact statement, ... even though the dam will not be completed for many years."). Here, however, there is no dispute that the threatened environmental harm is imminent.

**4.** The birdwatchers argue that they have a legal right of access to Naval Station property under the state tidelands trust. They also

dispute whether the Naval Station was in fact closed to the public, and have requested that we take judicial notice of an invitation to a political event at the station. We need not address the various motions for judicial notice made by both the appellants and the appellees because they do not affect our determination of the standing questions raised in this appeal.

view the birds at the Naval Station from publicly accessible locations outside the station is an interest sufficient to confer standing.

■ The district court held that the birdwatchers' interest in looking over the property line of the station to view the birds was insufficient to establish an injury in fact. Emphasizing that there is generally no right to a view over other property, the district court found that an adjacent viewer's aesthetic enjoyment is not a "legally protected interest." However, we have never required a plaintiff to show that he has a right of access to the site on which the challenged activity is occurring, or that he has an absolute right to enjoy the aesthetic or recreational activities that form the basis of his concrete interest. If an area can be observed and enjoyed from adjacent land, plaintiffs need not physically enter the affected area to establish an injury in fact. For example, the plaintiffs in *Laidlaw* had used specific areas in and around a river to picnic, birdwatch, walk, and swim but alleged that they would no longer be able to do so because the river had been polluted by the discharges from the defendant's facility upstream. *Laidlaw*, 528 U.S. at 182, 120 S.Ct. at 704–05; *see also id.* at 181, 120 S.Ct. at 704 (FOE member alleged injury in fact because "he lived a half-mile from Laidlaw's facility; ... he occasionally drove over the North Tyger River, and ... it looked and smelled polluted"). In finding that the plaintiffs had established an injury in fact, the *Laidlaw* Court did not state that actual use of the river by swimming, wading, or boating was necessary to establish standing, and drew no distinction between such activities and enjoying the river from the surrounding land by hiking, camping, picnicking, and driving near the river. *Id.* at 182, 120 S.Ct. at 705. The injury in fact requirement is designed to ensure that the litigant has a concrete and particularized interest distinct from the interest held by the public at large. *Defenders of Wildlife*, 504 U.S. at 562–63, 112 S.Ct. 2130; *Morton,*

405 U.S at 735, 92 S.Ct. 1361. That the litigant's interest must be greater than that of the public at large does not imply that the interest must be a substantive right sounding in property or contract.

■ To allege a legally protected, concrete aesthetic interest, a plaintiff must show merely that the challenged action affects his aesthetic or ecological surroundings. Our analysis in *Animal Lovers Volunteer Association, Inc. ("ALVA") v. Weinberger,* 765 F.2d 937 (9th Cir.1985) illustrates the correct approach, even though this case preceded *Defenders of Wildlife* and therefore does not speak directly to the standing requirements established in that case and in *Laidlaw.* In *ALVA,* we held that the plaintiffs did not have standing to challenge the Navy's practice of eradicating goats on San Clemente island because there was no public access to the island, which was a military enclave under the jurisdiction of the Navy. We found no standing because "San Clemente's goat control produces no 'direct sensory impact' on ALVA's own environment or on any environment to which ALVA members have access," *id.* at 939, and suggested that the injury in fact requirement would be satisfied "[i]f ALVA showed that the Navy's program would affect its members' aesthetic or ecological surroundings." *Id.* at 938. The fact that the site of the environmental damage was not publicly accessible was not fatal to the standing claim; rather, we held that ALVA could not establish a geographic nexus because none of its members suffered a concrete aesthetic or recreational injury as a result of the Navy's capricide. Here, by contrast, the plaintiffs *have* alleged a concrete aesthetic injury because they assert that their ability to view the birds and their habitat from the publicly accessible areas surrounding the station will be drastically limited, if not destroyed, by the Navy's actions.

■ The Navy's contention, raised for the first time at oral argument, that there is no injury in fact because the plaintiffs

have not shown that the birds have been harmed is similarly unavailing. The relevant showing for purposes of Article III standing is not injury to the environment but injury to the plaintiff. *Laidlaw,* 528 U.S. at 181, 120 S.Ct. at 704. It is undisputed that the reuse plan calls for the elimination of 26 acres of shallow water habitat used by the least tern, and the removal of the ficus trees that house the black-crowned night heron rookery. It is alleged that the destruction of these areas would result in aesthetic harm to the birdwatchers by interfering with their ability to enjoy viewing the birds in their habitats. *See id.* at 184, 120 S.Ct. at 705–06. That allegation is sufficient. Whether or not the birds might be happier in some other rookery is simply beside the point. To put it clearly, as we have held, "[r]equiring the plaintiff to show actual environmental harm as a condition for standing confuses the jurisdictional inquiry ... with the merits inquiry." *ERF,* 230 F.3d at 1151.

In sum, the birdwatchers have shown a concrete and particularized interest in observing the birds and their habitat from land adjacent to the station, and therefore have satisfied Article III's injury in fact requirement.

*Causation and Redressability*

◼ Once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed. The Supreme Court has recognized that the assertion of procedural rights is "special": "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Defenders of Wildlife,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130. In *Defenders of Wildlife,* the Court stated that a person living near the site for construction of a federally licensed dam has standing to challenge the agency's failure to prepare an EIS, even though he cannot establish with any certainty that the EIS will cause the license to be withheld or altered. *Id.*

◼ In finding that the appellants did not meet the redressability requirement, the district court did not acknowledge that the birdwatchers' procedural right reduces their burden of proving redressability. The district court emphasized that NEPA does not require agencies preparing an EIS to choose the alternative that maximizes benefits to the environment. However, to establish standing, the birdwatchers need not show that the revised EIS would result in the abandonment of the plans to build the marine container terminal. Relying on the discussion of procedural standing in footnote seven of *Defenders of Wildlife,* we have held that to establish redressability plaintiffs asserting procedural standing need not demonstrate that the ultimate outcome following proper procedures will benefit them. *See Oregon Natural Desert Ass'n v. Dombeck,* 172 F.3d 1092, 1094 (9th Cir.1998) (plaintiffs challenging the Forest Service's grant of a grazing permit without first obtaining certification that the activity would not violate water quality standards need not prove that the state would deny certification to satisfy the redressability requirement); *Douglas County,* 48 F.3d at 1501 (finding that uncertainty as to whether the findings of an EIS would affect the agency's determination is "not important" under *Defenders of Wildlife* ); *Seattle Audubon Soc'y v. Espy,* 998 F.2d 699, 702 (9th Cir.1993) (finding that the fact that redrafting the EIS might not change the agency's decision is not relevant to standing). The birdwatchers stand in a similar position to the hypothetical plaintiff in *Defenders of Wildlife* who lives adjacent to the construction site of a federally licensed dam; because they are seeking to enforce a procedural right under NEPA to protect their concrete interests, they have standing to challenge the adequacy of the Navy's FEIS even though they cannot establish that a revised EIS would result in a different reuse plan for the Naval Station. We therefore hold that the birdwatchers have standing to pursue their NEPA claim.

## IV. TAXPAYER STANDING

The birdwatchers contend that, as taxpayers of Long Beach and California, they have standing under § 526(a) of the California Code of Civil Procedure to assert state law claims for waste of government funds, improper public gifts, and misuse of tidelands trust assets. Section 526(a) provides:

An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or any other person acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax herein.

Cal.Code of Civ. Proc. § 526(a). We hold that the birdwatchers have not established that they have standing as taxpayers to bring their state law claims in federal court, and therefore affirm the district court's dismissal of these claims.

The California courts have interpreted § 526(a) to confer broad standing for taxpayers. *See, e.g., Blair v. Pitchess,* 5 Cal.3d 258, 268, 96 Cal.Rptr. 42, 486 P.2d 1242 (Cal.1971) (holding that unlawfully spent funds need not come from tax revenues to be actionable under § 526(a)). However, although the birdwatchers may well have standing under California law to bring their suit in state court, that does not help them here. A party seeking to commence suit in federal court must meet the stricter federal standing requirements of Article III. *ASARCO, Inc. v. Kadish,* 490 U.S. 605, 618, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989). California's lenient taxpayer standing requirements do not relieve the birdwatchers of the obligation to establish a direct injury under the more stringent federal requirements for state and municipal taxpayer standing. *See id.* at 617–18, 109 S.Ct. 2037 (noting that

plaintiffs who were permitted to bring a taxpayer claim in state court would not have had standing to commence a suit in federal court without a showing of a direct pocketbook injury).

To establish standing in a state or municipal taxpayer suit under Article III, a plaintiff must allege a direct injury caused by the expenditure of tax dollars; the pleadings of a valid taxpayer suit must "set forth the relationship between taxpayer, tax dollars, and the allegedly illegal government activity." *Hoohuli v. Ariyoshi,* 741 F.2d 1169, 1178 (9th Cir.1984); *see also Cammack v. Waihee,* 932 F.2d 765, 770 (9th Cir.1991) (holding that the "requirement of a pocketbook injury applies to municipal taxpayer standing as well as to state taxpayer standing."). When a plaintiff has failed to allege that the government spent specific amounts of tax dollars on the challenged conduct, we have denied standing. *See Doe v. Madison Sch. Dist.,* 177 F.3d 789, 794 (9th Cir.1999) (en banc). Here, the birdwatchers have not made a sufficient showing of a direct pocketbook injury resulting from the destruction of the Naval Station and the construction of the marine container terminal. Most of the birdwatchers' allegations involve construction costs and potential financial losses facing the Port of Long Beach, which does not receive tax dollars and is financed by its own revenues. Similarly, the birdwatchers will suffer no direct pocketbook injury from the bond issues relating to the conversion of the station and the alleged misuse of tidelands trust assets. The other portions of the amended complaint relating to the state law claims do not establish a relationship between tax dollars and the reuse project, but merely contain conclusory statements regarding waste of taxpayer monies, often indiscriminately lumping together allegations regarding waste of funds belonging to the Port, to the city, and to the tidelands trust. Because the birdwatchers have not alleged a direct injury caused by the expenditure of tax dollars, they have failed to satisfy

**684**

the requirements of taxpayer standing for purposes of Article III.

The birdwatchers argue that the state law right to sue created by Cal.Code of Civ. Proc. § 526(a) is sufficient to confer standing. They rely on *FMC Corp. v. Boesky*, 852 F.2d 981, 992 (7th Cir.1988), a Seventh Circuit case holding that the violation of a state-created legal right can, in itself, satisfy the injury in fact requirement for standing under Article III. We agree with the Seventh Circuit that state law can create interests that support standing in federal courts. If that were not so, there would not be Article III standing in most diversity cases, including run-of-the-mill contract and property disputes. State statutes constitute state law that can create such interests. For example, if § 526(a) had provided for monetary relief to a citizen suing under it, the requirements of Article III might well be met. *Cf. Vermont Agency of Natural Resources v. United States*, 529 U.S. 765, 120 S.Ct. 1858, 1861, 146 L.Ed.2d 836 (2000) (federal qui tam statute meets Article III requirements because the private plaintiff is an assignee of the government's damages action for misuse of federal funds). But § 526(a) does not so provide; it permits only injunctive relief, and taxpayer status, without more, does not suffice under Article III to demonstrate an injury in fact for purposes of such purely prospective relief. Accordingly, we hold that the birdwatchers have failed to establish Article III standing to commence their state law claims in federal court.

## V. CONCLUSION

The dismissal of the appellants' state law claims is AFFIRMED, and the dismissal of their NEPA claim is REVERSED. We REMAND to the district court for proceedings consistent with this opinion.