**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OREGON NATURAL RESOURCES
COUNCIL; KLAMATH SISKIYOU
WILDLANDS CENTER; UMPQUA
WATERSHEDS, INC.; HEADWATERS,
Oregon non-profit organizations,
                *Plaintiffs-Appellants,*

        v.

UNITED STATES BUREAU OF LAND
MANAGEMENT; ELAINE MARQUIS
BRONG, State Director of the
Bureau of Land Management for
Washington and Oregon,
                *Defendants-Appellees,*

        and

HERBERT LUMBER COMPANY,
                *Defendant-Intervenor.*

No. 05-35245

D.C. No.
CV-03-00478-HO

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael R. Hogan, District Judge, Presiding

Argued and Submitted
July 28, 2006—Portland, Oregon

Filed December 4, 2006

Before: Alfred T. Goodwin, A. Wallace Tashima, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Goodwin;
Dissent by Judge Tashima

19001

**COUNSEL**

Ralph O. Bloemers, Cascade Resources Advocacy Group, Portland, Oregon, for the plaintiffs-appellants.

Michael Gray, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C., for Federal defendants-appellees.

**OPINION**

GOODWIN, Circuit Judge:

Oregon Natural Resources Council Fund et al. (ONRC) appeals a summary judgment in favor of the Bureau of Land Management (BLM). We reverse and remand.

ONRC challenged the "Mr. Wilson" logging project in the Glendale Resource Area of the Medford BLM District in Oregon, on the ground that the project violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4370f. The specific violation was alleged to consist of conducting an insufficient Environmental Analysis. ONRC argues that the BLM did not sufficiently consider the cumulative impact of the Mr. Wilson logging project in conjunction with other past, present, and reasonably foreseeable projects on timber harvest levels and on the northern spotted owl's critical habitat. The district court concluded that because log-

ging operations had been completed the cause was moot, and granted summary judgment.

## I.  Background

The BLM issued an Environmental Assessment (EA) for the Mr. Wilson logging project in the Glendale Resource Area of the Medford BLM District in July 2001. In October 2001, the BLM issued a Finding of No Significant Impact on the human environment and therefore did not prepare a more thorough Environmental Impact Statement.

ONRC commenced this action to halt the project in a timely manner but did not succeed in obtaining a preliminary injunction. ONRC contends that the BLM failed to comply with NEPA's environmental review requirements and seeks declaratory and injunctive relief. The parties cross-moved for summary judgment, and the district court issued an order granting summary judgment to the BLM on June 23, 2004. Meanwhile, logging proceeded.

On August 23, 2004, ONRC moved the district court for relief from the summary judgment, citing two subsequent decisions: *Lands Council v. Powell*, 379 F.3d 738 (9th Cir. 2004), *as amended* 395 F.3d 1019 (2005), and *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004) (*KSWC*).

The district court denied the requested relief, holding that a change in law does not trigger Federal Rule of Civil Procedure 60(b)(5), and that there were no extraordinary circumstances present to warrant invocation of Rule 60(b)(6). The district court did state that "[n]otwithstanding [its holding], the court would reconsider the June 23, 2004 order in light of subsequent Ninth Circuit precedent if the court of appeals were to find that procedure to be appropriate." Final judgment was entered on February 7, 2005.

ONRC filed without success a motion for injunction pending appeal. The district court stated that *KSWC* "raises serious questions regarding this court's holding that the Bureau of Land Management's (BLM) analysis of cumulative effects on northern spotted owls and late-successional habitat dependent species and the habitat is sufficiently rigorous to satisfy the requirements of the National Environmental Policy Act." The court then denied ONRC's motion, stating that "[a]lthough plaintiffs have raised a serious question for litigation on the merits, this relatively small project is nearing completion, with only commercial thinning operations remaining on lands allocated for timber production."

On appeal ONRC contends that the Mr. Wilson EA lacked a sufficiently detailed analysis of the cumulative effects of past, present, and reasonably foreseeable future timber harvests on late-successional habitat.

## II.   De Novo Review

We review NEPA compliance *de novo*. *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1069-70 (9th Cir. 2002). Through the NEPA process, a federal agency must "take[ ] a 'hard look' at the potential environmental consequences of the proposed action." *KSWC*, 387 F.3d at 993 (quoting *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001)). "The agency's actions, findings, and conclusions will be set aside if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 992 (internal quotation marks omitted).

Our inquiry into whether an agency's decision was arbitrary or capricious "must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.' " *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

### III.   Mootness

**[1]** The BLM argues that this action is moot because all of the timber harvesting has been completed and there remain no project activities that could cause a significant environmental impact. "[I]n deciding a mootness issue, 'the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be *any* effective relief.' " *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244-45 (9th Cir. 1988) (quoting *Garcia v. Lawn*, 805 F.2d 1400, 1403 (9th Cir. 1986)).

> When evaluating the issue of mootness in NEPA cases, we have repeatedly emphasized that if the completion of the action challenged under NEPA is sufficient to render the case nonjusticiable, entities "could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine. Such a result is not acceptable."

*Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001) (quoting *West v. Sec'y of the Dep't of Transp.*, 206 F.3d 920, 925 (9th Cir. 2000)).

**[2]** In its complaint ONRC sought declaratory and injunctive relief in addition to costs, fees, and "[s]uch other and further relief as this Court deems just and proper." The Mr. Wilson project is not finished, and the absence of a proper Environmental Assessment affected, or at least could have affected, not only the logging decision but also the post-logging mitigation decision. The absence of the appropriate "hard look" analysis thus has present consequences. Although the harvested trees cannot be restored, "[b]ecause harm to old growth species may yet be remedied by any number of mitigation strategies," this case is not moot. *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1066 (9th Cir. 2002) (identifying possible relief beyond preventing logging includ-

ing ordering the Forest Service to study the timber sale's impacts on species viability and to mitigate those impacts in the sale area and elsewhere, ordering the Forest Service to adjust future timber plans to compensate for this allegedly unlawful one, and more direct species population intervention such as monitoring population trends and developing artificial habitats for their recovery). *Neighbors* involved claims under both NEPA and the National Forest Management Act of 1976 (NFMA), and while the court determined the case was not moot because of relief available under NFMA, it did *not* conclude that the appellants' NEPA claim was moot for lack of available relief. Rather, the court held there was no NEPA violation in the first instance, because the agency had taken the required "hard look" at potential environmental impacts. *Id.* at 1071. Conversely, the BLM has not taken the requisite "hard look" in this case, a failure that, as discussed below, has present consequences. Our holding is also consistent with *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006). In that case the logging company had a continuing right to cut trees that met certain tree mortality guidelines, while the three-year project term in this case has expired. However, the live controversy in *Earth Island* did not exist solely because of the prospective right to continue logging, but also because there were "a variety of measures that could provide some effective relief, including revising the tree mortality guidelines, monitoring of the California spotted owl, and obtaining more accurate population surveys" of certain bird species. *Id.* at 1157-58.

[3] In the instant case, thinning and other husbandry functions were yet to be completed at the time the case was submitted, and an appropriate EA can yet yield effective post-harvest relief. In addition to hazardous fuel and slash pile management (together with related mitigation of past damage and prevention of future damage that could be accomplished by road closures), erosion prevention, and monitoring of the logging effects on northern spotted owl activity, the record in this case reveals BLM preparation for future sales in contigu-

ous or neighboring habitat areas. All such concerns have to be considered with reference to habitat deterioration in the "hard look" required in a legally sufficient EA.

## IV.   How the EA falls short

The Mr. Wilson Environmental Assessment is inadequate for the reasons previously explained in *KSWC*. First, the BLM failed to disclose and consider quantified and detailed information regarding the cumulative impact of the Mr. Wilson logging project combined with past, present, and reasonably foreseeable logging projects. Second, the EA was tiered to other documents that did not contain the requisite site-specific information about cumulative effects.

### A.   *Quantified and Detailed Information*

[4] The BLM failed to disclose and consider quantified and detailed information regarding the cumulative impact of the Mr. Wilson logging project combined with past, present, and reasonably foreseeable logging projects. The BLM distinguishes the requirements of an Environmental Assessment from an Environmental Impact Statement (EIS), and argues that the Mr. Wilson EA contains enough information to allow it to determine that the project would have no significant environmental impacts. This argument in effect says that the EA is sufficient "because we say it is." As discussed below, case law in this circuit holds that such an answer must be supported by proper procedure.

In determining whether a proposed action will significantly impact the human environment, the agency must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7). NEPA's implementing regulations define cumulative impact as "the impact on the environment which

results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

The Mr. Wilson EA's discussion of cumulative impacts identifies seven past and future actions which could affect the watershed. The EA notes that:

> The Key Elk, Mr. Wilson, and future Bear Pen and Willy Slide timber sales, would remove or modify up to approximately 1,000 acres of late-successional habitat. Several large blocks greater than 300 acres, functioning as corner to corner contiguous habitat with other blocks, are likely to be substantially reduced, and fragmented. The remaining small isolated habitat blocks in some sections are likely to be harvested, removing the last late-successional blocks in some sections.

The EA then addressed the effects of this removal on high mobility and low mobility species. "Species with high mobility, such as northern spotted owls, would likely still be able to disperse across the landscape," while "[t]he dispersal capability of species with low mobility, such as Del Norte salamanders, red tree voles, and mollusks, would be substantially reduced . . . ."

[5] *KSWC* addressed a similar cumulative impact objection to EAs. Like the Mr. Wilson EA, the EAs at issue in *KSWC* did not contain objective quantified assessments of the combined environmental impacts of the proposed actions. *KSWC*, 387 F.3d at 994. The discussion of future foreseeable actions consisted of "an estimate of the number of acres to be harvested. A calculation of the total number of acres to be harvested in the watershed is a necessary component of a cumulative effects analysis, but it is not a sufficient descrip-

tion of the actual environmental effects that can be expected from logging those acres." *Id.* at 995. The EAs also stated that environmental concerns such as air quality, water quality, and endangered species would not be affected. *Id.* However, "[t]he EA is silent as to the degree that each factor will be impacted and how the project design will reduce or eliminate the identified impacts. This conclusory presentation does not offer any more than the kind of general statements about possible effects and some risk which we have held to be insufficient to constitute a hard look." *Id.* (internal quotation marks omitted). Both the Mr. Wilson and the *KSWC* EAs "do not sufficiently identify or discuss the incremental impact that can be expected from each successive timber sale, or how those individual impacts might combine or synergistically interact with each other to affect the [watershed] environment." *Id.* at 997.

B.  *Tiering*

**[6]** The Mr. Wilson EA is tiered to documents which did not contain the requisite site-specific information about the impacts of past, present, and reasonably foreseeable logging.

> "Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

40 C.F.R. § 1508.28.

**[7]** The Mr. Wilson EA is tiered to the West Fork Cow Creek Wastershed Analysis, and to the Medford District Proposed Regional Management Plan-EIS (RMP-EIS). In *KSWC*,

we held that the Medford District RMP-EIS could not save the EAs because it was missing "any *specific* information about the cumulative effects. Neither in the RMP-EIS nor in the EAs does the agency reveal the incremental impact that can be expected . . . as a result of each of *these* four successive timber sales." *KSWC*, 387 F.3d at 997. The BLM contends that, unlike the Mr. Wilson project land, the land involved in *KSWC* was not matrix land identified to produce a sustainable supply of timber and other forest commodities. However, both cases involve Tier 1 Key Watersheds which contain designated critical habitat for the northern spotted owl. *Id.* at 992. Contrary to the BLM's contention, *KSWC* is not distinguishable on this ground. Tiering to the Medford District RMP-EIS does not save the EA's cumulative effects analysis. Prepared in 1997, the West Fork Cow Creek Watershed Analysis similarly does not address the incremental impact of the Mr. Wilson logging project, and therefore does not save the cumulative effects analysis. Moreover, the Watershed Analysis is not a NEPA document and therefore the EA cannot tier to it. *Id.* at 998.

## V.    Conclusion

[8] The summary judgment is reversed. On remand, the district court is instructed to enjoin the remainder of the Mr. Wilson project until the BLM provides a revised Environmental Assessment, including the required hard look at cumulative impacts of the logging already completed on contiguous habitat areas or neighboring habitat areas to be impacted by contemplated future sales.

**REVERSED and REMANDED with instructions.**

---

TASHIMA, Circuit Judge, dissenting:

The district court dismissed this case "because logging operations had been completed [and] the cause was moot."

Maj. op. at 19004-05. Without disagreeing with the underlying facts — that all logging and hauling operations have been completed and all that remains to be done to complete the project is some minor cleanup work in the form of hand piling and slash burning — the majority holds that this case is not moot. Because, in this case which presents only a challenge under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321-4370f, I disagree with that conclusion, I respectfully dissent.

"A moot action is one where 'the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.' " *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). It is the constitutional "duty of this court, as of every other judicial tribunal . . . to decide actual controversies by a judgment which can be carried into effect, and not to give opinions on moot questions." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1072 (9th Cir. 2002) (Thompson, J., dissenting in part) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)) ("*Cuddy Mountain II*"). Accordingly, if effective relief cannot be granted, we lack jurisdiction. *Id.* (citing *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)).

All of the logging and hauling of trees at the BLM's Mr. Wilson logging project was completed in September 2005, more than one year ago.[1] Our cases are clear that, in these circumstances, no effective relief is available under NEPA. In *Headwaters, Inc. v. Bureau of Land Management*, 893 F.2d 1012, 1013 (9th Cir. 1990), plaintiffs alleged that the BLM managed the logging of three units of a timber sale in viola-

---

[1]At the time of oral argument, all that remained to be done was hand piling and slash burning, *i.e.*, minor clean-up. Even that, undoubtedly, has now been completed; however, we do not know for certain because the majority has declined to ask for a current report on the status of the Mr. Wilson project.

tion of the Federal Land Policy and Management Act of 1976. At the time of the appeal, the three units included in the sale had already been logged. *Id.* at 1014. Even though defendants still had to haul 50 percent of the logs from the site, and plaintiffs "made a broad request for such other relief as the court deemed appropriate," we deemed the case moot because "[n]o relief [would] bring back the trees." *Id.* at 1013, 1015 & n.6, 1016; *see also Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377, 1379 (9th Cir. 1979) ("Where the activities sought to be enjoined have already occurred, and the appellate courts cannot undo what has already been done, the action is moot."). In the instant case, the slash burning that remains to be completed is an extremely trivial component of the overall project, *i.e.*, one that, if independently assessed, undoubtedly would have no significant environmental impact. Thus, in this case, even less remains to be done to complete the project than in *Headwaters*, which we deemed moot.

*Sierra Club v. Penfold*, 857 F.2d 1307 (9th Cir. 1988), a case involving NEPA challenges to a mining operation in Alaska, is also instructive. There, we deemed a challenge to an Environmental Assessment ("EA") moot when the mining season had already expired. *See id.* at 1317-18. We stated that "even if we assume BLM's decision making process is unlawful, no adequate remedy exists. Unlike a power transmission line, a completed mining operation cannot be moved. The impact of the Plan mines are not remediable since we cannot order that the Plans be 'unmined.' " *Id.* at 1318. Similarly, in the instant case, we cannot order that the trees be "unharvested."[2]

---

[2]The majority's reliance on *Cantrell v. City of Long Beach*, 241 F.3d 674, 678-79 (9th Cir. 2001), maj. op. at 19007, is also misplaced. Even though *Cantrell* involved NEPA claims, the marine container terminal project at issue had not yet been completed. While the buildings on the Naval Station had been destroyed and the trees and structures of the station had been razed, construction of the terminal was ongoing, and we noted that "the defendants could consider alternatives to the current reuse plan." *Id.* at 678. In the instant case, there is no reuse plan at issue and there are no alternatives that can be considered. Practically speaking, the project is complete and, unlike *Cantrell*, no effective relief is available.

It is important to remember that NEPA is only a procedural statute, *i.e.*, it "imposes procedural requirements, but not substantive outcomes, on agency action." *Lands Council v. U.S. Forest Serv.*, 395 F.3d 1019, 1026 (9th Cir. 2004). The majority asserts that this case is not moot because "harm to old growth species may yet be remedied by any number of mitigation strategies." Maj. op. at 19007 (quoting *Cuddy Mountain II*, 303 F.3d at 1066). But the majority forgets that, unlike *Cuddy Mountain II*, this case involves *only* a NEPA challenge. *Cuddy Mountain II* also involved alleged violations of the National Forest Management Act ("NFMA"), a statute that imposes substantive requirements, as well as alleged violations of NEPA. It was in that context that we held that the completion of logging did not moot the case because various mitigation measures under the NFMA could provide effective relief.[3] No such relief is possible under NEPA. *See Nat'l Audobon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 202 (4th Cir. 2005) (noting that courts "should take care not to craft a remedy that extends beyond what NEPA itself and its implementing regulations require").

While it is true that ONRC sought an injunction barring future timber sales in the Mr. Wilson project area, that is a remedy that was available only before the completion of logging, *i.e.*, to require compliance with NEPA *before* cutting was complete; it is not available as a mitigation measure. "[R]elief under NEPA must be tailored to *remedy* the particular violations in the case; courts will not issue injunctions under NEPA only as prophylactic or punitive measures." *Bergland*, 576 F.2d at 1379. Considering that "NEPA itself authorizes no private right of action," *Penfold*, 857 F.2d at 1315, it is inappropriate to allow substantive remedies for violations of a procedural statute. *Cf. Cuddy Mountain II*, 303

---

[3]The majority's reliance on *Cuddy Mountain II* is all the more puzzling given its double-barreled admission that mootness was avoided in that case only "because of relief available under NFMA," maj. op. at 19008, and that "there was no NEPA violation" in that case. *Id.*

F.3d at 1073-74 (Thompson, J., dissenting in part) ("A study can do nothing to ameliorate the loss of old growth habitat unless the study could lead to effective relief. . . . [as o]ld growth cannot be constructed [and] takes centuries to develop[,] . . . mitigation is not possible.").

In concluding that this case is not moot, the majority also relies on *Earth Island Institute v. U.S. Forest Service*, 442 F.3d 1147, 1157-58 (9th Cir. 2006). Maj. op. at 19008. In *Earth Island*, however, the project was not yet completed, because the logging company still had a contractual right to cut down more trees. 442 F.3d at 1157. Here, unlike in *Earth Island*, defendant-intervenor Herbert Lumber Company cannot cut more trees. The three-year term of the project, which began on April 4, 2003, has expired.

In addition, *Earth Island*, like *Cuddy Mountain II*, involved alleged violations of NFMA, a statute which imposes substantive environmental requirements on the United States Forest Service ("USFS"). *See id.* at 1154 (citing 36 C.F.R. § 219.12); *Lands Council*, 395 F.3d at 1032-33 (noting that once the USFS develops and adopts a Forest Plan, "NFMA prohibits any site-specific activities that are inconsistent with the Forest Plan"). To the extent that NFMA has the substantive aim of preserving species, it makes sense to adopt remedies to further that goal. In fact, the mitigation remedies proposed in *Cuddy Mountain II* specifically pertained to the plaintiffs' NFMA claims. *See* 303 F.3d at 1072-74 (Thompson, J., dissenting in part). To that end, in neither *Earth Island* nor *Cuddy Mountain II* did we to confront the issue we are faced with today: whether a court can provide any effective relief in a case raising only procedural issues under NEPA, when all logging and hauling have already been completed. Thus, those cases simply do not support the majority's reliance on them for holding when a case alleging only NEPA violations becomes moot. As our precedents demonstrate, effective relief is no longer available under these circumstances in a NEPA case.

Because the Mr. Wilson logging project has been virtually completed, requiring the BLM to do a makeover of the EA will not further the purposes of NEPA. NEPA is a forward-looking statute that requires the federal agency to "consider every significant aspect of the environmental impact of a *proposed* action." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978) (emphasis added). And we have stated that "the comprehensive 'hard look' mandated by Congress and required by the statute must be timely, . . . not as an exercise of form over substance, and *not as a subterfuge designed to rationalize a decision already made*." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (emphasis added).

Here, our injunction will not help any public officials make decisions because those decisions have already been made — there is no *proposed* action pending. Here, surely, requiring the preparation of a new EA is an exercise of form over substance and all it can do is rationalize a decision, not only already made, but already carried out.

In keeping with the incongruity of deciding the merits in a case in which no effective relief can be ordered, the majority "instructs" the district court "to enjoin the remainder of the Mr. Wilson project until the BLM provides a revised Environmental Assessment, including the required hard look at cumulative impacts of the logging already completed on contiguous habitat areas or neighboring habitat areas to be impacted by contemplated future sales." Maj. op. at 19012. But what is the purpose of requiring the preparation of a hypothetical EA to examine the "cumulative impacts *of the logging already completed*"? Further, as I read the majority's mandate, it does not prohibit the BLM from abandoning, or permitting Herbert Lumber Company to abandon, the project without completing any remaining hand piling and slash burning, if it elects not to prepare a new EA. I assume that such abandonment would leave the project area in a slightly more degraded condition,

but without any major environmental consequences.[4] Again, I ask, to what end and for what purpose are we requiring that such a hypothetical injunction be issued.

Finally, I note that the majority mischievously extends NEPA's environmental review requirement beyond the statute's original intended purpose. It first notes that "the record in this case reveals BLM preparation for future sales in contiguous or neighboring habitat areas." Maj. op. at 19008-09. It then orders that the new EA take a hard look at "contiguous habitat areas or neighboring habitat areas to be impacted by *contemplated future sales*." *Id.* at 13 (emphasis added). It cites no authority in support of this startling extension of NEPA. NEPA's "hard look" requirement is limited to "major federal actions significantly affecting the quality of the human environment." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004) (quoting 42 U.S.C. § 4332(2)(C)). *See also* 40 C.F.R. § 1508.18 (defining "major federal action"). Unlike the majority's "contemplated action," the statutory term "major federal action" is a well-understood (and extensively litigated) term of art under NEPA. No case of which I am aware — and the majority cites none — supports the application of NEPA to contemplated future action. The majority's imposition of an EA for "contemplated future sales" is thus an unwarranted extension of NEPA.

For all of these reasons, I respectfully dissent from the majority's conclusion that this case is not moot and its reaching and deciding the merits of this case.

---

[4]This assumes, because the majority is determined not to find out the facts, *see* footnote 1, *supra*, that the project has not already been completed.